UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**DOUGLAS RUPARD**,

    Plaintiff,

    v.

**ALEJANDRO N. MAYORKAS**,

    Defendant.

Case No. 22-cv-01806 (CRC)

## MEMORANDUM OPINION

In 2017, veteran Customs & Border Patrol ("CBP") employee Douglas Rupard was granted permission by the agency to telecommute due to the effects of a prior back injury. In response, Rupard claims, his supervisors added insult to injury by subjecting him to a barrage of taunts and adverse job actions. Seeking recompense, Rupard sued the Secretary of the CBP's parent agency, the Department of Homeland Security, under the Rehabilitation Act. He brings claims for discrimination, retaliation, and maintenance of a hostile work environment. The government moves to dismiss the case, arguing that Rupard failed to administratively exhaust most of his allegations and that the rest fail to state valid claims. Concurring, the Court will grant the government's motion.

### I. Background

The Court draws the following factual background from the allegations in the complaint, which it must accept as true for purposes of this motion. See Sissel v. U.S. Dep't of Health & Human Servs., 760 F.3d 1, 4 (D.C. Cir. 2014).

Mr. Rupard has worked in CBP's Occupational and Safety Division ("OSD") since 2002 and currently serves as its Senior Safety and Health Program Manager. Compl. ¶¶ V.1, V.3. In that role, Rupard acts as the Division's representative to CBP headquarters in connection with

various projects.  Id. ¶ V.13.  Rupard's duty station was in Baltimore before it was changed to Washington, D.C. in 2018.  Id. ¶¶ V.13.

In November 2017, CBP granted Rupard's request to work from home on a daily basis due to medical needs resulting from a back injury he suffered in a 1988 car accident.  Id. ¶¶ V.4–6.[1]  According to Rupard, this accommodation did not sit well with his supervisor, OSD Deputy Director Steven Tilden.   Rupard alleges that after his accommodation was granted, Tilden accused Rupard of "taking advantage" of his back condition in order to telecommute and mocked him in sometimes lewd and degrading terms.  Id. ¶ V.8.  Most prominently, after Rupard underwent oral surgery, Tilden allegedly joked about how it would affect Rupard's ability to engage in oral sex with men.  Compl. ¶ V.16.  And when Rupard sought treatment for a potentially cancerous tumor, Tilden reportedly quipped that Rupard would soon need chemotherapy and have to sit "in the corner wearing a diaper."  Id. ¶ V.17.[2]  Tilden also insinuated on occasion that Rupard was malingering.  Id. ¶ V.18.

---

[1] Rupard's complaint suggests that his November 2017 reasonable accommodation entitled him to work from home without exception.  Compl. ¶¶ V.5–6, V.12.  By contrast, the government has directed the Court to a December 8, 2018 email from Rupard to Rebekah Salazar, the Director of CBP's Privacy and Diversity Office ("PDO"), concerning his perceived treatment by one of his supervisors.  In the email, Rupard notes that the accommodation was approved on the condition that he physically report to work in Washington for ad hoc meetings when his presence was necessary.  Repl. Ex 5, at 3.  The email is relevant to whether Rupard exhausted certain of his claims, an issue discussed further below.  The government suggests that the Court can consider the email without converting its motion to one for summary judgment because the complaint specifically references it.  Compl. ¶ 14; see, e.g., Ward v. D.C. Dep't of Youth Rehab. Servs., 768 F. Supp. 2d 117, 120 n.2 (D.D.C. 2011).  The government is surely correct that the Court can consider the email to resolve the issue concerning which Rupard referenced it in the complaint, namely, whether his communication with Ms. Salazar was a "contact with an EEO counsel" for purposes of administrative exhaustion.  See Opp'n at 9.  The Court is less certain, however, whether it can consider the content of the email in connection with different issues, including Rupard's description of his reasonable accommodation.  Given this uncertainty, the Court will refer to the email but not rely on it for any purpose other than the resolution of the exhaustion issue.

[2] Like Rupard's characterization of his reasonable accommodation, the description of this incident in the complaint varies from that in Rupard's December 8, 2018 email to Ms. Salazar.

Rupard further alleges that when he was on family leave in March 2018 dealing with his spouse's health issues, another supervisor, Erick Eastes, ordered him to report daily to DHS's Emergency Operations Center in Washington D.C. for the duration of an ongoing influx of immigration along the southwest border. Compl. ¶ V.10. Soon after, Tilden informed Rupard that he was required to be in the office at least once a week, despite his accommodation. Id. ¶ V.12. Several months later, Tilden officially changed Rupard's duty location from Baltimore to D.C. Id. ¶ V.13.

On December 8, 2018, Rupard emailed Rebekah Salazar, Executive Director of CBP's Privacy and Diversity Office ("PDO"), about Tilden's alleged disregard of his reasonable accommodation. Def.'s Reply Supp. Mot. Dismiss ("Def.'s Reply"), Ex. 5 at 2. In the email, Rupard noted Tilden's improper comments, the directives to report to D.C., and the duty location change. Id. at 3–5.

Finally, the complaint alleges that, in the spring of 2020, Rupard's supervisors narrowed his job duties and adjusted his chain of command. Specifically, Rupard says he was asked to cease participating in certain meetings, to stop sharing information with working groups, and to route completed work through a lower-level employee. Compl. ¶¶ V.21, V.25. He further claims that the Director of OSD, Mic McKeighan, told him not to work overtime. Id. ¶ V.23. Then, in July 2020, Rupard nominated three fellow employees for awards, but claims Tilden refused to accept his nominations. Id. ¶ V.27. That same month, Rupard reported Tilden and McKeighan to the CBP's Executive Assistant Commissioner, claiming they had attempted to

---

There, he reported that he told Tilden that he was experiencing nausea due to low-level chemotherapy treatments following surgery to remove the tumor, to which Tilden responded, "at least you're not wearing a diaper." See Def.'s Reply, Ex. 5 at 4. Again, however, the Court will consider the Salazar email only for exhaustion purposes.

post a COVID-19 job hazard analysis that had not been properly approved.  Id.  ¶ V.28.  According to Rupard, a colleague later relayed that Tilden had accused Rupard of "roll[ing] them under the bus" and threatened to "take care of him."  Id.  On August 11, 2020, Tilden issued Rupard a formal letter of reprimand charging him with failing to follow supervisory instructions and several instances of unprofessional behavior.  Id. ¶ V.31; Mot. Dismiss, Ex. 1.

In addition to these incidents, Rupard asserts that the agency retaliated against him by not acting on his Equal Employment Opportunity ("EEO") complaint for over 500 days, and for delaying approval of his security clearance.  Compl. ¶¶ VI.65–66.

On September 22, 2020, Rupard initiated the agency EEO process by filing an informal complaint with CBP's EEO office, which he formalized three months later.  Mot. Dismiss, Ex. 2 at 1.  Having received no decision on his EEO claim for over 180 days, Rupard filed this suit in June 2022.  As noted above, the complaint raises claims of discrimination, hostile work environment, and retaliation under sections 501 and 505 of the Rehabilitation Act, 29 U.S.C. § 791(f).  The government moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6).

## II. Legal Standards

Dismissal under Rule 12(b)(6) is appropriate when the complaint "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The complaint must contain sufficient factual matter, accepted as true."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "[D]etailed factual allegations" are not necessary, but the complaint must provide "more than labels and conclusions" or "a formulaic recitation of the elements of cause of action."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (1955).  Failure to exhaust administrative remedies subjects unexhausted claims to dismissal under Rule 12(b)(6).  Latson v. Holder, 82 F. Supp. 3d 377, 385 (D.D.C. 2015).  However, because failure to exhaust administrative remedies

is an affirmative defense, "the defendant bears the burden of pleading and proving it." Bowden v. United States, 106 F.3d 433, 437 (D.C. Cir. 1997).

### III. Analysis

#### A. Exhaustion of Discrimination and Retaliation Claims

The government moves to dismiss nearly all of Rupard's discrete discrimination and retaliation claims for failure to exhaust administrative remedies. Plaintiffs must timely exhaust administrative remedies prior to filing an action under the Rehabilitation Act. Doak v. Johnson, 798 F.3d 1096, 1099 (D.C. Cir. 2015). Equal Employment Opportunity Commission ("EEOC") regulations require aggrieved persons to "initiate contact with a[n EEO] Counselor" within 45 days of the alleged discriminatory action or within 45 days of the effective date of a personnel action. 29 C.F.R. § 1614.105(a)(1). Exhaustion is not a "mere technicality" because presenting concerns in an administrative complaint puts the agency "on notice" and helps to "narrow[] the issues for prompt adjudication and decision." Wheeler v. Becerra, No. 20-CV-01287 (CRC), 2021 WL 3288079, at *3 (D.D.C. Aug. 2, 2021) (cleaned up).

Rupard initiated contact with a CBP EEO counselor on September 22, 2020. Mot. Dismiss, Ex. 2 at 1. Thus, acts that took place in the preceding 45-day period beginning on August 8, 2020 are properly exhausted. But only one of the events supporting Rupard's discrete discrimination and retaliation claims occurred in this timeframe: Tilden's issuance of the letter of reprimand on August 11, 2020.

Rupard's main retort is that his December 2018 email to Rebekah Salazar, the Director of the CBP's Privacy and Diversity Office, noted above, also qualifies as an EEO complaint for exhaustion purposes. Not so. Multiple courts in this district have adopted the EEOC's interpretation of the phrase "initiat[ing] contact" with a counselor. Gulakowski v. Barr, No. CV 19-32 (JEB), 2019 WL 4469241, at *6 (D.D.C. Sept. 18, 2019); Welsh v. Hagler, 83 F. Supp. 3d

212, 218 (D.D.C. 2015). Based on that reading, an employee properly "initiates contact" if she "(1) contact[s] an agency official logically connected with the EEO process (not necessarily a Counselor) and (2) demonstrate[s] an intent to begin the EEO process." Gulakowski, 2019 WL 4469241, at *6 (citing EEOC Management Directive 110, at ch. 2, § I.A, n.1). Rupard contends that Salazar would have recognized his "pleas for help as an intent to begin the EEO process." Opp'n at 10. But the email itself evinces no such intent. It is presented as an appeal of Tilden's directive that Rupard report to D.C. weekly, with the sole request being that Rupard's reasonable accommodation be respected. Def.'s Reply, Ex. 5; see Welsh v. Hagler, 83 F. Supp. 3d 212, 221 (D.D.C. 2015) (finding plaintiff had no intent to begin EEO process as emails "merely describe[d] the events that transpired" and "sought to clarify [plaintiff's] reasonable accommodation"). While the email notes other objectional conduct by Tilden, it neither references the EEO process nor communicates a "desire to move forward administratively." Welsh, 83 F. Supp. 3d at 221. So, even if Salazar was a proper EEO contact, Rupard did not communicate the intent necessary to trigger the administrative process. The one alleged discriminatory act that occurred in the 45 days prior to this December 8, 2018 email—the duty location change from Baltimore to D.C. in November of 2018—is therefore not properly exhausted.

Nearly all of what remains of Rupard's discrimination and retaliation claims are premised on events that predate the exhaustion window created by his only valid EEO contact. Rupard's contention that these separate alleged acts "constitute one unlawful employment practice" does not salvage the claims. Opp'n at 12. Discrete discrimination and retaliation claims must each be separately exhausted, at least for those allegations occurring prior to the administrative complaint. Moran v. Barr, No. CV 18-1986 (CKK), 2020 WL 4286825, at *5 (D.D.C. July 27,

2020).  The government is therefore entitled to dismissal of Rupard's discrimination and retaliation claims to the extent they are based the following alleged events:

- Eastes's March 2018 directive to report to D.C. for the duration of the Southwest Border influx, Compl. ¶¶ V.10–11;

- the November 2018 change in Rupard's duty location from Baltimore to D.C., id. ¶ V.13;

- Tilden's March 2020 directive to cease participating in meetings and sharing information with working groups, id. ¶ V.21;

- McKeighan's March 2020 instruction to cease working overtime, id. ¶ V.23.

- Tilden's May 27, 2020 directive to route all completed work through a junior employee, id. ¶ V.25;

- Tilden's reference to Rupard as an "HQ liaison," id. ¶ V.24;

- Tilden's June 2020 reprimand of Rupard for "schooling him on PPE" and giving others the impression that Rupard was Tilden's supervisor, id. ¶ V.26;

- Tilden's July 2020 refusal to accept Rupard's employee award nominations, id. ¶ V.27; and

- Tilden's comments in July 2020, following Rupard's complaint about the posting of a supposedly unauthorized COVID-19 job hazard analysis, that he would "take care of [Rupard]" for "rolling [McKeighan and Tilden] under the bus," id. ¶ V.28.[3]

---

[3] Rupard claims that he reported these comments by contacting the CBP's Employee Assistance Program (EAP).  Compl. ¶ V.28.  The complaint, however, lacks any indication that Rupard demonstrated an intent to begin the EEO process by reaching out to the EAP.  On the contrary, the complaint indicates that the EAP process resulted in Rupard obtaining a counselor to help assist him with anxiety associated with the July 2020 threat.  Id. ¶ V.30.

One final point. As part of his retaliation claim, Rupard also alleges that CBP unduly delayed its approval of his security clearance and its adjudication of his EEO complaint. Compl. ¶¶ V.65–66. While Rupard provides no time frame for these allegations, because they relate to his retaliation claim, the Court will assume the events took place after Rupard filed his informal EEO complaint. The Court withholds judgment on whether these complaints were properly exhausted and will instead resolve them on the merits (and in the government's favor) in the following section.

B. The Merits of the Remaining Discrimination and Retaliation Claims

Section 501 of the Rehabilitation Act "prohibits federal agencies from engaging in employment discrimination against disabled individuals." Crews v. Carson, No. 19-CV-3538 (CRC), 2020 WL 12948520, at *8 (D.D.C. Oct. 16, 2020). Rupard brings two claims under the Rehabilitation Act, one for disability discrimination and the other for retaliation. The government moves to dismiss the claims premised on (1) the issuance of the letter of reprimand; (2) the mishandling of Rupard's security clearance; and (3) the adjudication of his EEO complaint. The Court addresses each in turn.

1. *Letter of Reprimand*

On August 11, 2020, Tilden issued Rupard a formal letter of reprimand. The government contends that issuance of the letter does not constitute a discriminatory or retaliatory act as a matter of law. The Court agrees. To plead a viable disability discrimination claim, a plaintiff must show that "he suffered an adverse action because of his disability." Dougherty v. Cable News Network, 396 F. Supp. 3d 84, 101 (D.D.C. 2019). An "adverse action" must entail "'a significant change in employment status . . . or a decision causing significant change in benefits.'" Taylor v. Small, 350 F.3d 1286, 1293 (D.C. Cir. 2003). Meanwhile, a retaliation claim requires a plaintiff to show that she "suffered (i) a materially adverse action (ii) because []

8

she had brought or threatened to bring a discrimination claim." Baloch v. Kempthorne, 550 F.3d 1191, 1198 (D.C. Cir. 2008). Courts define a "materially adverse" action as one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Garza, 2023 WL 2239352 at *6 (cleaned up).[4]

The letter of reprimand issued to Rupard was neither an "adverse employment action" nor a "materially adverse action." "Run-of the mine letters of reprimand are generally not adverse employment actions," at least when they are not "abusive and do not lead to disciplinary action." Bell, 2022 WL 4534603, at *6. The relevant portion of the letter, which the government has properly included in the record, advised Rupard that "any future misconduct may subject [him] to more severe disciplinary action," including "removal from the federal service." Mot. Dismiss, Ex. 1 at 4. On its face, then, the letter appears to have had little to no impact on Rupard's job. And while the letter was to remain in Rupard's personnel folder for up to three years, he offers nothing to suggest that it resulted in any tangible discipline or affected the terms and conditions of his employment at all. Finally, the letter "contained no abusive language," just "job-related constructive criticism." Baloch v. Kempthorne, 550 F.3d 1191, 1199 (D.C. Cir. 2008). As a result, the letter of reprimand cannot sustain a claim of discrimination or retaliation.

---

[4] In a recent Title VII discrimination case, the D.C. Circuit removed the requirement that challenged employment actions be accompanied by an "objectively tangible harm." Chambers v. District of Columbia, 35 F.4th 870, 878 (D.C. Cir. 2022) (en banc) (holding that the statutory text requires only discrimination against the employee "with respect to the terms, conditions, or privileges of employment" (cleaned up)). The Circuit has "long interpreted Title VII and the Rehabilitation Act in parallel," see Montgomery v. McDonough, 2023 WL 4253490, at *8 n.14 (D.D.C. June 29, 2023), leading some district courts to remove the "objectively tangible harm" requirement from Rehabilitation Act discrimination claims, see, e.g., Bain v. Office of Attorney General, 2022 WL 17904236, at *19–20 (D.D.C. Dec. 23, 2022). Since the Court determines that Rupard did not suffer an adverse employment action under either the pre- or post-Chambers standard, the Court need not decide whether Chambers applies to Rehabilitation Act cases.

 2. *Security Clearance*

Next up is Rupard's allegation regarding his security clearance. The lone mention of this allegation in the complaint comes in paragraph 66, which states that CBP "retaliate[d] against Mr. Rupard by threatening his employment in various ways, including delaying and requiring a probationary period for [his] security clearance to be approved." Compl. ¶ 66. Rupard offers no supporting facts detailing the circumstances of the alleged delay, including who was involved or when it happened, or how it is connected to either his disability or any protected activity. He also does not respond to the government's discussion of the claim's deficiencies in its motion to dismiss, thus appearing to concede the issue. For all those reasons, the Court will dismiss Rupard's retaliation claim to the extent it is based on the agency's handling of his security clearance.

 3. *Delay in Processing the EEO Complaint*

Last, Rupard alleges that the government retaliated against him by "failing to acknowledge the discrimination complaint for over 500 days." Compl. ¶ VI.65. But, the government points out, "allegations of an agency's improper processing of an administrative complaint do not support an actionable claim." Koch v. White, 967 F. Supp. 2d 326, 336 (D.D.C. 2013) (citing Smith v. Casellas, 119 F.3d 33, 34 (D.C. Cir. 1997)). Any claim based on the processing delay of the EEO complaint thus fails as a matter of law, too.

C. Hostile Work Environment Claim

That leaves Rupard's claim that CBP subjected him to both a discriminatory and retaliatory hostile work environment. To make out a hostile work environment claim, a plaintiff must show that his employer subjected him to "discriminatory [or retaliatory] intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Román v. Castro, 149 F. Supp. 3d

10

157, 166 (D.D.C. 2016) (cleaned up) (citing Baird v. Gotbaum, 662 F.3d 1246, 1251 (D.C. Cir. 2011)). "[S]everity and pervasiveness are determined by reference to all the circumstances, including the frequency of the . . . conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Baird v. Gotbaum, 792 F.3d 166, 169 (D.C. Cir. 2015). The "abusive working environment" must also be linked to either plaintiff's "membership in a protected class" or engagement in a "protected activity." Román, 149 F. Supp. 3d at 166–67, 170.

      The government does not contest that Rupard administratively exhausted his hostile work environment claim. But his allegations fail to support the claim as a matter of law. To start, most of Rupard's allegations consist of ordinary, employment-related actions, which courts in this district generally have held "are not sufficiently severe or offensive to support a hostile work environment claim." Swann v. Office of Architect of Capitol, 73 F. Supp. 3d 20, 32 (D.D.C. 2014) (Cooper, J.). These alleged actions include Tilden's diminution of Rupard's responsibilities and directive to direct work through a lower-level employee, McKeighan's instruction to stop working overtime, Tilden's refusal to adopt Rupard's employee award nominations, and the agency's delay in approving his security clearance. Compl. ¶¶ V.21–V.25, V.27, VI.66; see also Bell v. Gonzalez, 398 F. Supp. 2d 78, 92 (D.D.C. 2005) (holding that work-related actions such as "exclusion from the informal chain of command, close monitoring of [ ] work, missed opportunities for teaching, travel, and high-profile assignments, and [ ] reassignment" lacked severity for hostile work environment claim). Nor can a run-of-the-mine letter of reprimand like the one here support a hostile work environment claim. See Crews v. Carson, No. 19-cv-3538 (CRC), 2020 WL 12948520, at *5 (D.D.C. 2020). Consistent with this

11

precedent, Rupard's allegations of "generally normal workplace strife do not reveal a pervasive pattern of abuse." Jimenez v. McAleenan, 395 F. Supp. 3d 22, 38 (D.D.C. 2019) (Cooper, J.).

What's left of Rupard's hostile work environment claim centers on the alleged comments by Tilden recounted earlier. Some of these comments can be described as petty slights, like Tilden's supposed protestation that Rupard had "school[ed] him on PPE" and given others the impression that he was Tilden's supervisor. Compl. ¶ 26. Others are too generally stated to draw any real conclusion about their severity in context, such as the allegations that Tilden "mocked" Rupard and accused him of "taking advantage" of his disability. Id. ¶¶ 7–8. And at least one remark—the reference to Rupard as an "HQ liaison"—does not seem particularly objectionable, given that it is consistent with how Rupard himself describes his job duties in the complaint. Id. ¶ 24; see also id. ¶¶ 11, 20.

Two of Tilden's alleged comments are indeed patently offensive as recounted in the complaint and, if they were made, have no place in any workplace. Those include his reference to oral sex following Rupard's dental surgery and his purported comment that Rupard "would soon need chemotherapy and [] be sitting in the corner wearing a diaper" following his diagnostic cancer procedure. Id. ¶¶ 16–17.[5] A third statement—the alleged threat to "take care of" Rupard following his complaint about Tilden's attempted posting of an unauthorized COVID-19 flyer— can fairly be taken as intimidating. But these clearly inappropriate comments—either standing alone or viewed together with the more ambiguous and innocuous ones—do not, under the circumstances of this case, meet the high bar in this Circuit for establishing "severe and pervasive" workplace hostility. Even with the handful of more

---

[5] As noted previously, however, while the Court will consider only the complaint's description of the latter comment, Rupard recounted it in different, less offensive terms in his December 2018 email to Rebekah Salazar. See Def.'s Reply, Ex. 5 at 4.

troublesome comments, the overall severity of the statements is insufficient to support a claim. See, e.g. Brooks v. Grundmann, 748 F.3d 1273, 1277 (D.C. Cir. 2014) (finding that an "isolated expression of frustration," together with less severe conduct, "in the aggregate" did not create a hostile work environment); Bell v. Gonzales, 398 F. Supp. 2d 78, 92 (D.D.C. 2005) (holding that "sporadic use of abusive language" and "[o]ccasional instances of less favorable treatment" were insufficient to establish a hostile work environment).

The alleged comments also span several years and are separated by several months or more. Courts have frequently rejected hostile work environment claims with similar temporal profiles. See, e.g., Jimenez v. McAleenan, 395 F. Supp. 3d 22, 37 (D.D.C. 2019) (holding that seven mostly minor incidents over two and a half years was "temporarily diffuse" and suggested "lack of pervasiveness"); Achoe, 2018 WL 4374926, at *8 (intermittent acts over four years); Ross v. Georgetown Univ., Civ. A. No. 18-0671 (ABJ), 2019 WL 2452326, at *9 (D.D.C. June 12, 2019) (three incidents over two and a half years); Laughlin v. Holder, 923 F. Supp. 2d 204, 220 (D.D.C. 2013) ("isolated incidents" over the span of several years). Rupard also fails to connect many of the statements with his disability or protected activity, which is required for an actionable hostile work environment claim. See, e.g., Bell, 2022 WL 4534603, at *7 ("Workplace slights unconnected to any protected status do not create a hostile work environment[.]").

Finally, Rupard partially rests his hostile work environment claim on the agency's alleged efforts to "undermine [his] reasonable accommodation," Comp. ¶ V.56, by relocating his duty station and ordering him to report to D.C. during the spring 2018 border crisis, Compl. ¶¶ V.10– V.11, V.13. At least one court has suggested, in dicta, that the "prolonged denial of a reasonable accommodation" could "underlie a hostile work environment claim when 'all the circumstances' would support such a claim." Floyd v. Lee, 85 F. Supp. 3d 482, 517–18 (D.D.C.

2015) (cleaned up).  <u>Floyd</u> noted that if plaintiff could have proved a failure-to-accommodate, then this claim, combined with the evidence of verbal harassment presented, could "perhaps just barely" support a jury finding of hostile work environment.  <u>Id.</u> at 518.  But even if that were the law, Rupard does not allege that any denial of his reasonable accommodation denial was "prolonged," nor does he bring a failure-to-accommodate claim under the Rehabilitation Act.  And "all the circumstances" here do not support Rupurt's hostile work environment claim in any case.  As discussed above, Tilden's alleged comments are insufficiently hostile as a whole, too scattered temporally, and mostly unrelated to Rupard's disability.  Accordingly, Rupard has not stated a valid hostile work environment claim.

## IV. Conclusion

For the reasons stated, the Court will grant Defendant's Motion to Dismiss.  An Order accompanies this memorandum opinion.

_____<br>
CHRISTOPHER R. COOPER<br>
United States District Judge

Date: <u>August 31, 2023</u>